Case No. 24-1606 Thank you. May it please the Court, Michael Levy for Appellant Tyrone Pennick. I want to touch on three things, three issues from our appeal today. I plan to start with what is point two in our brief, the Confrontation Clause violation. Then I'll address point three, which was the double counting of drug quantity at sentencing. And then, if there's any time, I'll address point one, which is the issue about the probable cause under the search warrant. And I'd like to reserve two minutes for rebuttal. So I'm going to start with the Confrontation Clause issue. Mr. Pennick's Crawford violation. The entire case, the entire trial, was about whether the drugs that Geneva Smith was arrested with. Let me ask you about that, Mr. Levy, because I always think it's useful to have questions, so you know what my concern might be. There was a document that was admitted that contained Ms. Smith's home address, as I understand it, without objection. Is that correct? It is not correct, Your Honor. It was covered by the same motion in Lemonnet that covered Ms. Smith's statements. So isn't it usually incumbent, you know, you and I have been, I think a number of people have been around the block, incumbent on one party or the other, even after a motion in Lemonnet, to object in a timely fashion at the time that the challenge document or the challenged hearsay comes in? It's not, Your Honor. And we cited some cases from this Court for that proposition, Yu Leung and McDermott. And McDermott, by the way, cites the Federal Rules of Evidence 103B, which I don't think we cite in our brief, but says this as well. And the idea is if you move in Lemonnet, there are some things this Court has said, if you move in Lemonnet, you still have to pop up at the time. A 403 determination is something this Court has said can't really be done before trial, so you may move in Lemonnet, but you have an obligation to jump up. Otherwise, if you make a motion in Lemonnet and it is fairly presented, which it was in this case, it was a categorical, clear, should not admit any statements from Geneva Smith to police. And if I could pause for one second to say, that should have been obvious to everyone and I am not sure why it was not. I don't know what the government was thinking even getting within 100 miles of things Geneva Smith said to the police. But it was a categorical motion saying everything she said, and that includes her consent to search and statements she made there, should be excluded. And then this Court has said if it's capable of pretrial resolution, which this clearly was, it's just a flat Crawford violation to get into that, and then there's a ruling, and there was. The judge said do not touch this. So let's assume hypothetically that we were to agree with you on this issue, that it was an error. Why is it harmless under the circumstances of this case? Because the competition clause analysis is subject to harmless error analysis. It is. It has to be harmless beyond a reasonable doubt, because it's constitutional error, not just evidence. There was a person testifying that, you know, he's a drug dealer. I helped him to traffic in cocaine. There's back and forth. I forget the Smith's address. There's all this back and forth. They find the drugs in her car after surveilling her and so on. So just tell me why this is not harmless. Because this was the whole case, and that's what the government said when it was trying pretrial and arguing to get in a bunch of Ms. Smith's statements. And this is at Appendix 416 and Appendix 418. They said they knew what this trial was about. It was about Mr. Pennick's defense, that it was her cocaine, it was unbeknownst to him, and that she was the one doing all this. Everything found in that house was found hidden away. So it's not like they walked in and found it all lying out in front of him. The whole question of trial was 416 to 418 is probably between the government and the court. Yes. That is the government before. That's the motion to eliminate where the government is explaining why it wants Ms. Smith's statements. Oblivious to Crawford, as far as I can tell. I do not understand that. You may hear me say that a couple of times. But why they would think it is appropriate to try to prove this up through Ms. Smith's statements. But in any event, they were clear what they wanted to prove. They wanted to overcome the defense that she – these were her drugs exclusively and that the stuff hidden in the house was hers exclusively. And that's what they said at summation. That's at A1067, to sum it all up, to say why their cooperator should be believed. And cooperators don't have to be believed. I agree it's sufficient evidence, but it's not conclusive evidence. Why, when Mr. Pennick was never apprehended with any drugs, was not sitting in a house with drug paraphernalia out in front of him. It was all hidden away. Why should the jury conclude it was his and not hers alone? And at A1067, they say, you know that Geneva Smith was not the mastermind of this operation because after she was arrested, they asked for consent to search her house. And then paraphrasing here, they went to her house, and it was completely clean. That was the argument the government pounded the table on. So to say this is harmless beyond a reasonable doubt, the standard being that the verdict was surely unattributable to the error is not something I think this Court can do. Is it sufficient evidence? That's what the government has argued in its brief. It actually hasn't even argued that it was – that it was harmless beyond a reasonable doubt. They just point out that there is sufficient evidence. Was there sufficient evidence? Sure. But a jury needs to make that determination. Unless the other question is to turn to the double counting. Yes. Thank you. On the double counting, I think this is a pretty easy one because I'm not even sure there's any particular disagreement from the government on the core facts. There were four kilograms that the Court found. Two of them were the ones that Smith was apprehended with. One is the aggregation of the drug dealing that the cooperator said he had done in the – in the weeks – with Mr. Pennick in the weeks before the arrest. And then the last kilogram was the cocaine value of $49,000 found in the wall. And it was also in the $49,000. Yes. And absent that last one, we are in the – we are – we are in the category that caps out at 3.5. The obvious inference, and there's not a shred of evidence to suggest otherwise. Didn't your client testify that he got that money from his girlfriend? He certainly testified that it wasn't drug proceeds at all. Well, why – Or didn't testify, but that was his position. Why couldn't the judge credit that? If the judge had credited that the – that the – that it wasn't drug proceeds at all, then we wouldn't be here at all. Then we would be at 3 kilograms. But he testified he got it from his girlfriend. You're saying he got it from his girlfriend as drug proceeds? No. I'm saying our position, the position of the defendant, was these weren't drug proceeds at all. That was certainly – he didn't testify, but that was certainly the position at trial, was that these were never drug proceeds and shouldn't be included. At sentencing, the court – You changed position? No, same position, not drug proceeds. The court rejected that and found that this was drug proceeds. But if it was drug proceeds, it was the proceeds of the same kilogram that Mr. Cherry had been – had been buying over the past week. So that's the only other drug trafficking that was ever discussed. We don't know based on this record. You're asking for a vacate and remand. I mean, we could vacate and remand if we were to agree with you and ask a district court judge to re-sentence, but there could be some basis in the record. There is no basis presently in the record that I can tell, but I agree that it is not – we are not asking that you dictate that the guidelines range are this. But there has been no finding on it whatsoever. It was preserved even to the extent it wasn't preserved. This court applies relaxed plain error. And in this case, it had huge consequences. It bumps the guidelines range by something like five years, and he got sentenced above the guidelines range anyways. So the sentence genuinely would likely come down a significant amount if the court, in looking at this, were to say, oh, that's a good point. I actually don't have any reason to believe that these $49,000 comes from anything other than the one kilogram of transactions with Don L. Cherry that he testified about. This is all the same thing. For what it's worth, Judge Arcaro actually made a very similar finding in a case we cited to Berks. So I suspect even he would likely say, oh, okay, actually, this – you know, this – maybe I made a mistake and really might have a significant effect on the defendant's sentence. All right. So you reserve some time for this. Yes. Thank you. Mr. Levy, thank you very much. Ms. Richards. Good morning. Good morning. May it please the Court. Monica Richards on behalf of the United States. The confrontation clause argument with regard to that, I think, as the Court noted, initially, its initial question to Deployee that the – was – there was, in fact, this document that was admitted that contained her address. That was never objected to. It was on the government's exhibit list the whole time. The argument that was made pretrial was very specific. But you heard Mr. Levy say that once there's been a motion to eliminate, that preserves the objection through the trial and the exceptions set forth in the rules. What's your response to that? I disagree that that objection was properly made in that motion. The motion papers and what was honed out or what was ferreted out before the trial had nothing to do with that document, the admissibility of that specific consent-to-search form that had the address on it. That's something different here. What we had before trial was an argument about three statements that were made by Ms. Smith. She, at that point, had been murdered. And so we had these statements that we were concerned about in terms of things that came in. And those were raised pretrial, correctly, as they should be. And the judge said, okay, let's just stay away from that. Let's stay away from those statements. Those are testimonial. Sorry? Those are testimonial hearsay statements, presumably. Yes. Right. Correct. And so those statements and then this testimony went in from the detective about having obtained the consent-to-search and the address on the form. And then sometime later in the testimony, when the government was interested or getting close to the point where it was interested in those statements, you know, looked to the court for the ruling. We're going to take a pause here. We need a ruling. No ruling had been made with regard to that specifically. Let me ask you this. I don't understand the government's theory as to why Mr. Pinnock had no reasonable expectation of privacy for 89 immersions. I'm sorry? Why is it still the government's position that he had no reasonable expectation of privacy? Oh, I'm sorry. My mistake. Yes. We had a we had a we had there was a motion that was made. He had the opportunity to present an affidavit of standing. What he presented to the court was insufficient. And here in any event, we had a probable cause finding. But yes, Your Honor, the position is he did not present to the court a basis for standing that is something that this court would accept. But he was on pre-trial. He was on supervision at the time, right? Correct. The government knew where he lived. Otherwise, probation would have no idea how to supervise. I'm not going to dispute, Your Honor. That's absolutely true. But that is not in this court. Again, we can't rely on the government's proof for such things. This is a I'm not going to stand up here and tell you absolutely there's no reason looking back at this thing to think he might have had standing. We did. We had probable cause to go into that location because. His counsel put it in an affidavit indicating that's where he lived. Yeah, but he didn't know that. That's not what this court usually when we see these things. His lawyer didn't know where he lived? Back then? I mean, he was in jail when this lawyer got him. I don't know. But the reason about usually when we see these things, it's somebody who lives in the house. It's a wife. It's a girlfriend. It's a child. It's somebody, the landlord. It's somebody else who has the personal knowledge. That's what's key here, the personal knowledge as to who lives there. But that's what we did not have here. I don't know why there wasn't an affidavit from Mr. Penick except that he didn't want to admit to it. I don't know. I don't know why he didn't put in his own affidavit if he had, you know, reason to do so. Did he not consent to search as part of the terms for pretrial release? Also true. That came out later in the proceedings. The district court judge ultimately in one of the — this thing came up about five times during this trial about whether or not he was entitled to see the CI testimony with regard to the search warrant. And ultimately, yes, the district court judge, Judge Arcaro, did say, what are we talking about here? This was somebody who was on pretrial release. So that would seem to dispose of the most interesting aspects of this question, because if he didn't have an expectation of privacy in the premises, then he doesn't have standing. And that was ultimately, yes, Your Honor, what the judge looked at. There's a couple things on this case that take us off the path, that take us down these pathways that are ancillary or sideways to the main argument here. But here, the search warrant was supported by probable cause, excuse me, and there were three judges that looked at it. There were three judges who heard the reasons why the consent — why the confidential informant's testimony deserved to be sealed, not disclosed to this defendant. And they all decided the same way. Is that the limit? In other words, it's a very narrow issue, I thought, but maybe I'm wrong, that's before us. As I understand it, the issue is whether the — was it Judge Arcaro or the mastery judge? It depends. We all looked at — they both looked at it. Well, whoever refused to disclose the search warrant application based on the CI, is that the limited issue before us? Yes. Okay. And then that is where standing comes in and so on. Yes. Okay. Yes. And the government's position is that we actually don't have to deal with the standing issue if we agree with you, for example, on the underlying issue, either as a matter of probable cause or whether it was right or an abuse of discretion or otherwise, to refuse to disclose the application. Is that correct? Correct. If there's no further questions on — No. — that point. Okay. On that point. With regard to the double-counting argument, again, this is another issue that is taking us off the beaten path here. What we had was multiple opportunities for this dependent. It's not off the beaten path. I'll take that part back, but I won't take back the part that it's — I'm sure you'll defend, but I've got to — I'll just tell you, and I usually won't do this, but I don't see in the record where there is non-speculative evidence, some support for the notion that the $49,000 in currency that was found in his dishwasher, I think, wasn't directly associated with or the proceeds of another kilogram that Giancara counted. Yeah, but we don't know how many — as this Court noted, there's nothing in this record to even support that. That's pure speculation that won for one. No, no, no, but it's pure speculation in yours for the benefit of appeal of Mr. Levy's client, Mr. Pettig. Respectfully. Not the government. So if — let me just give you a hypothetical, Ms. Richards, and then you can tell me if I'm right or wrong. If the dishwasher, Giancara, had said, I speculate that the $49,000 represents proceeds of a separate kilogram amount of cocaine, would that have been something that could be challenged successfully? No. I mean, I — well, yes. I mean, I speculate if he actually said that. Yes, so that gets to the point. So if we think, if we conclude that the finding was based on speculation and not hard record evidence, circumstantial or direct, then why isn't your answer the same thing? Because that argument, what we're reviewing here for at this very moment is plain error review with regard to that specific argument. The only arguments that were made before the district court, even setting aside all that trial testimony that they put on with regard to the source being legitimate money, the moment when we get to the FATICO hearing and then the objections to the PSR, he's still saying that could be legitimate income. He's still saying things about whether or not that money — he's not arguing that this is a one-for-one correlation. We don't know that this was the only — this was a conspiracy of this charge. We don't know that this was the only, you know, deals that were done in this thing. There's no evidence to suggest that. You heard my question to you, Mr. Levy. Why not — if we're not sure, right, because there's — as Mr. Levy said, there's a lot riding on that difference, five years at least. If we're not sure, then why not — or if we think that there's been an inadequate justification for that particular material finding, why not remand it and have Judge O'Connor tell us if there's something? Or he might tell us, as Mr. Levy indicated, ah, maybe I got that wrong. Maybe I — it was all guesswork. I'm trying to imagine what that would look like, honestly. I don't know what that would look like. What would that be like? Would that be another hearing or testimony? Like, who would — how would we know that that money, after he's said 10 times — or I'm going to exaggerate on that — but after he's put in all this evidence that it was legitimate money, now he comes forward and says, look, I don't know what that would look like, Your Honor. Oh, yeah, by the way, that was mine, and it was a directly — There was no credibility finding. I mean, it's not that Judge O'Connor said, I don't credit. It's just he said, I find that the $49,000 corresponds to an extra kilogram of cocaine. Where is the extra — where is that — just look at the record. Tell me where in the record that is justified. What about the record tells me that it's separate and apart from the kilogram of cocaine that Mr. Sherry provided? My time is up, if I could answer. Of course. No. The argument was not made, that testimony, that finding, that this is not the money from Mr. Sherry's kilogram trafficking. That's why maybe it's plain error, but it's subject also to sort of this clear error analysis. If it's clearly wrong, why isn't that plain error? Because it's — if it's all of the categories, maybe that's the last factor. But it's not plain or — it's not plain or error here. I disagree with the Court's analysis in that respect. I do think that here, again, I'm trying to imagine, what would that possibly look like here? We have no — the timeframe here, there's a lapse of time between the time that Mr. Sherry was wheeling and dealing with Mr. Penick. We have — he was out on pretrial release for four years. We have no idea what that money — which deals. Like, how would we even — I don't know what the facts would be from his side or from our side to establish that, Your Honor. Maybe I'm thoroughly confused, but when you say we have no idea, isn't that the point? Isn't that the argument, that we have no idea where this is coming from? We do, though. It's coming from drug dealing. That's the point. No, but is it the same kilogram or a different kilogram? That's the point. And where can you tell me in the record that Judge O'Connor said, this is why I know that the $49,000 found in this dishwasher is proceeds of a different deal for a different kilogram of cocaine than what Mr. Sherry provided, that I've already counted. Tell me that. I'm going to have to disagree again, Your Honor, with your — he does not say that. That argument was not presented. What was presented was, this was cash wrapped in shrink wrap, found in a dishwasher, that he tried to blame on all sorts of other — not blame, excuse me — that he tried to put all sorts of other different justifications for, never once saying, oh, yeah, that's the money from Mr. Sherry. Don't count that again. That never happened. That's the argument, is that he didn't — that Judge Arcaro could draw an inference from the fact that he did not dispute that the — one way or the other — that the money came from Mr. Sherry. Or did — I'm sorry. Did — yeah, that it came from Mr. Sherry. It would have to be one-to-one dealings to buy into this argument. It would have to be one-to-one. Like, today I sold him a big, and then I got that money. And today I sold him another big, and then I got that money. But here we've got a lapse of time, and there's nothing to tie those together. So that he was dealing in drugs is fact A. He had some other dealings with — he had some dealings that we know about, specific dealings with Mr. Sherry that he testified to at trial. But there's nothing to say in this record, Your Honor, exactly that, that this wasn't drug proceeds relating to other deals. Just — I think maybe I'm confused. Just tell me very simply, Ms. Richards, what was the basis in the record for Judge Arcaro's determination that the $49,000 found in the dishwasher represented the proceeds of a separate transaction that was not the transaction with Mr. Sherry that he'd already counted? What was that? Other than he didn't — that Mr. Pennick didn't argue that. Was there something in the record? No, but I — right, there was not. You put me in the corner on that. Absolutely. I'm not putting you in the corner. No, it's true. It's okay. I've been here before. I've been here before. I'm just trying to understand. No, but that's the point. It doesn't have to be. This is very clever. This is very clever. I give that to them. You read the brief. It's a very clever argument. But that doesn't mean that this was the one-to-one. Well, I've known Mr. Levy a long time. Well, right. And I know that Mr. Levy is a worthy adversary here. But this is a clever argument because we don't need to say that. When the Judge Arcaro is making those sentencing findings, he's saying that it's drug proceeds. One-to-one, this would require a demonstration by the defendant that this was one-to-one, this deal, this cash, this deal, this cash, to get to the $49,000. That's not going to happen. That's not what the law requires. The law here is, was this stuff hidden in the dishwasher looking like drug perks? There is evidence of how many drug transactions over this period of time. Yeah, but who knows if he saved it or went out and spent it again. But I understand how many, but there were more drug transactions. Yes. How many? Well, he did smaller deals. This wasn't like a kilogram transaction, if I'm understanding the Court's concern. This wasn't like, he wasn't dealing in kilogram quantities with Mr. Cherry. It was smaller individual quantities. So those would have to line up perfectly for this $49,000 to be Mr. Cherry. It doesn't work that way. Sorry that I'm trying to get myself out of the corner, but that's my answer. No, no, no. Maybe that's your job. I don't know. Well, thank you so much. No further questions? Rest of my brief. Thank you. Thank you, Your Honor. I would ordinarily take credit for all sorts of amounts of being clever. It's not that clever an argument. Mr. Cherry testified that in the weeks leading up to Mr. Penick's arrest, he had done a series of transactions that added up to one kilogram. He testified that the way these transactions worked is he would receive the drugs and later he would pay Mr. Penick. This is the weeks before Mr. Penick's arrested. And then Mr. Penick is arrested and in his dishwasher is one kilogram's worth of cash. There's nothing that clever about it. So, I'm sorry. Let me just go back. So, Mr. Cherry says during a very specified period of time, they have one transaction and they have multiple transactions. More than one, but it adds up to. The judge even added it all up, the number of transactions over those weeks that Mr. Cherry testified about. Adds up to one kilogram. Adds up to one kilogram and that was a finding the judge made. He said, okay, I'm adding it all up and that adds up to one kilogram. And then there's one kilogram of cash sitting in Mr. Penick's home. So, he counted Mr. Cherry's testimony, one kilogram, okay, and then he says, oh, I'm also going to count the kilogram that's, I'm sorry, the proceeds that corresponds to roughly a kilogram of cocaine that were found in the dishwasher. Right. From, without the obvious. This is. Mr. Richards is shaking a bit. No. This is, I mean, you can look back, this is why I say it's not all that clever. I think anybody looking at the money in the dishwasher would say it comes from the kilogram worth of transactions that Mr. Cherry testifies he did. So, were there other transactions other than with Mr. Cherry? Not in the record. The only thing they testified about was, there was testimony about transactions years earlier. That was the subject of a fatico hearing. But that was years and years ago. He's a drug dealer. So, the question becomes whether the judge can draw the inference that money stored in his dishwasher is the proceeds of drug transactions and whether he has a basis, he does have a basis for concluding that it's the proceeds of transactions with Mr. Cherry. Yes, 100%. He has a basis for it. He also has a basis for saying that he's a drug dealer. Both those things can be true. What he didn't have a basis for was to say it's the proceeds of a transaction not involving Mr. Cherry. I've heard no evidence about such transactions. I have no reason to believe such transactions exist. But I find that this money somehow comes from something other than the transactions with Mr. Cherry. I don't think he would make that finding on remand. I think it just slipped by. I mean, just apropos of Mr. Richards, your friend on the other side. So, if we were to agree with you and send it back, and you said in your opening that you're not asking us to construct a particular, instructions are required to impose a particular sentence. So, what would he do? He would recognize that the burden is on the government to show that this comes from some other transaction, and he would ask them what proof they have that that $49,000 comes from some transaction other than the ones that Mr. Cherry said he had paid in the weeks leading up to when the money was found. And if that exists... Is this plain error analysis? No. We think this is preserved. He said don't count, you know, they objected, don't count the cash as drug quantity. That is in the objections to the PSR, which in this case were actually filed on the docket and treated as objections to the court. So, it's not like those just went to probation. And we have that. I don't have it handy, but we cite it in our brief. But the PSR comes out, and it includes the cash, and there is an objection to that that is made to the court. And remind me the Delta as a consequence of his counting the cash as what? So, it moved the guidelines range up two levels, and as a result of moving the guidelines range up two, sorry, the offense level up two levels, and as a result just where he is on the chart, it raises it from 168 to 210 up to 210 to 262. So, he got sentenced incorrectly under the 210 to 262 range when it should have been significantly lower at 168 to 210. I know I'm over my time. I wanted to address one factual thing relating to the preservation of the Confrontation Clause error. There was a suggestion from my colleague that the only thing that was at issue in the motion in limine was three particular statements by Ms. Smith and not the ones that we have at issue here, so that when the court said stay away from it, the court was only talking about those three. Just to understand how that evolved, the defense moved categorically to keep Ms. Smith's statements on that evening out, and the government responded, we want to introduce three of them. So, it was the government that narrowed it down to three. I think that may or may not be right, but ultimately the motion in limine did focus on those three statements that were made by Ms. Smith to the law enforcement officials. Is that correct? Yes, and this was not one of them. It was not one of those statements, the one we're objecting to now. But the reason it wasn't is because the defense says we move to preclude all of this. The government comes back and says we're only pushing on three of them, and that's where the argument then focused. So, the government disavowed everything except for those three. Where's the disavow? The disavow was not an affirmative disavow. Was it a specific disavow with respect to the document that showed her address? No, it wasn't in that respect, but I guess my point is that the motion was all of this should stay out, everything she said. And the government responded with we don't care about the rest. My question is did she say what appears on the document that was submitted? Yes, that came from her. I mean, that is the consent form is her own. That is her statement, her testimonial statement. And the only reason it wasn't a focus, my point is the reason it wasn't a focus of the pretrial motion in limine argument is because the government in response to a broader motion said, well, there are only three things we care about. And so that's where it went. Then they snuck in the other thing. Maybe that was clever on their part. I would submit that that leaves defense counsel on the edge of their seat the entire trial for things that the government has not even said they're trying to put in and that the court has said stay away from. We argue this is a preserved objection. Okay. Well, thank you very much. Very clever arguments on both sides. We'll reserve the decision.